DEXTER D. ANDERSON,

        Plaintiff,

        v.

UNITED STATES OF AMERICA,
B.R. JETT, Warden,
S. YOUNG, Associate Warden,
C. NICKRENZ, Associate Warden,
M. NELSON, Clinical Director-DR,
L. KRIEG, Doctor,
J. SCHULTZ, CDR-Rehab Services, and
J. FEDA, DPT-OSC-Rehab Services,

        Defendants.

Civil No. 11-1486 (DWF/LIB)


**REPORT AND RECOMMENDATION**

Dexter D. Anderson, Federal Correctional Institution - Milan, P.O. Box 1000, Milan, Michigan, 48160, Plaintiff, pro se.

David W. Fuller, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota, 55415, for Defendants.

The above-named Plaintiff, Dexter D. Anderson, is a federal prison inmate. He commenced this action by filing a complaint seeking relief under the Federal Tort Claims Act, ("FTCA"), and Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). (Docket No. 1.) Defendants have filed a motion asking to have this action dismissed, or in the alternative, for summary judgment. (Docket No. 40.) The motion has been fully briefed by the parties, and the matter has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court will recommend that Defendants' motion for

summary judgment be granted, and this action be dismissed with prejudice.

## I. BACKGROUND

Plaintiff is serving a 300-month prison sentence that was imposed after he was convicted for federal drug and firearms offenses. (Declaration of Angela Buege, [Docket No. 51], ¶ 3.) In 2007, Plaintiff was serving his sentence at the Federal Correctional Institution in Pekin, Illinois. While he was there, he injured his left knee playing football. (Declaration of Lonnie Krieg, [Docket No. 53], [hereafter "Krieg Decl."], p. 2, ¶ 3; Affidavit in Support with Exhibits of Dexter D. Anderson, [Docket No. 4], [hereafter "Plaintiff's Aff."], ¶s 3-6.) The injury apparently bothered Plaintiff for several months, and in June 2008, he was given an MRI. (Krieg Decl., ¶ 3.) "The MRI revealed a complete tear of the Anterior Cruciate Ligament (ACL) and bone bruise or microtrabecular fracture involving the tibial plateau and medial femoral condyle." (Id.)

After the MRI, Plaintiff was transferred to the Federal Medical Center in Rochester, Minnesota, ("FMC-Rochester"). When he arrived there on June 24, 2008, his medical care status was classified as "Level 1." (Id.)[1]

On August 29, 2008, Plaintiff's MRI and other medical records were reviewed by Defendant Lonnie Krieg, a physician employed by the federal Bureau of Prisons, ("BOP"), who works at FMC-Rochester. (Id., ¶s 1, 4.) Doctor Krieg recommended that Plaintiff should be referred to the Mayo Clinic for an orthopedic consultation regarding his injured

---

[1] According to Plaintiff, "Care levels start at one thru four, the higher the number, it indicates the more medical attention an inmate requires." (Complaint, p. 9, ¶ 27.) It appears that Plaintiff might actual mean to say that a smaller number corresponds to a greater level of care – i.e., an inmate assigned to "Level 1" is presumed to need more medical attention than an inmate assigned to "Level 2."

2

left knee.  (Id., ¶s 4-5.)

In October 2008, Plaintiff was examined by Dr. Bruce Levy, a physician working in the Department of Orthopedic Surgery at the Mayo Clinic.  (Id., ¶ 5.)  Dr. Levy determined that Plaintiff had "valgus malalignment of the left knee, chronic ACL deficiency of the left knee, and medial compartment osteoarthrosis of the left knee."  (Id.)  After requesting a new set of x-rays, Dr. Levy concluded that Plaintiff "may be an ideal candidate for combined high tibial osteotomy[2] and ACL reconstruction."  (Id.)

---

[2] A Wikipedia article, (http://em.wikipedia.org/wki/osteotomy), provides the following description of a high tibial osteotomy:

"The most common type of osteotomy performed on arthritic knees is a high tibial osteotomy, which addresses cartilage damage on the inside (medial) portion of the knee. The procedure usually takes 60 to 90 minutes to perform.

During a high tibial osteotomy, surgeons remove a wedge of bone from the outside of the knee, which causes the leg to bend slightly inward. This resembles the realigning of a bowlegged knee to a knock-kneed position. The patient's weight is transferred to the outside (lateral) portion of the knee, where the cartilage is still healthy.

After regional or general anesthesia is administered, the surgical team sterilizes the leg with antibacterial solution. Surgeons map out the exact size of the bone wedge they will remove, using an X-ray, CT scan, or 3D computer modeling. A four- to five-inch incision is made down the front and outside of the knee, starting below the kneecap and extending below the top of the shinbone.

Guide wires are drilled into the top of the shinbone (tibia plateau) from the outside (lateral side) of the knee. The wires usually outline a triangle form in the shinbone.

A standard oscillating saw is run along the guide wires, removing most of the bone wedge from underneath the outside of the knee, below the healthy cartilage. The cartilage surface on the top of the outside (lateral side) of the shinbone is left intact. The top of the shinbone is then lowered on the outside and attached with surgical staples or screws, depending on the size of the wedge that was removed. The layers of tissue in the knee are stitched

3

While Plaintiff's surgical options were being reviewed and considered, he was engaged in a physical therapy program overseen by Defendant Jessica Feda, a physical therapist employed by the United States Public Health Service, ("PHS"), who was assigned to work with inmates at FMC-Rochester. Feda conducted an initial assessment of Plaintiff in July 2008, (shortly after his arrival at FMC-Rochester), and recommended a rehabilitative exercise program for his knee injury. (Declaration of Jessica Feda, [Docket No. 52], [hereafter "Feda Decl."], ¶ 3.) Feda consulted with Plaintiff, and offered information to him, on many occasions during his confinement at FMC-Rochester. (Id., ¶s 3-7.)

Plaintiff alleges that in October 2008, he talked to Feda about the dual surgery proposed by Dr. Levy – i.e., the ACL reconstruction combined with high tibial osteotomy. (Complaint, p. 6, ¶ 5.) Plaintiff allegedly told Feda that he would "allow the A.C.L. reconstruction," but he "didn't want the high tibial osteotomy," because he thought it was "unnecessary." (Id.) Feda allegedly agreed with Plaintiff's opinion. (Id.)

In April 2009, Dr. Levy examined Plaintiff once again, and requested a new MRI. (Krieg Decl., ¶ 6.) On June 8, 2009, Dr. Levy met with Plaintiff again, and they reviewed the potential risks and benefits of the contemplated ACL reconstruction and high tibial osteotomy. (Id.)

At about the same time, (June 2009), Plaintiff discussed his surgery options and rehabilitation plans with Feda and Defendant Jon Schultz. (Feda Decl., ¶ 8.) Schultz is a PHS employee who was working as a Supervisory Physical Therapist at FMC-Rochester. (Declaration of Jon Schultz, [Docket No. 48], [hereafter "Schultz Decl."], ¶ 1.) Plaintiff

together, usually with absorbable sutures."

alleges that Feda and Schultz coerced him into accepting the dual surgery, (ACL reconstruction and high tibial osteotomy), that was proposed by Dr. Levy. (Complaint, pp. 6-7, ¶s 7-13.)[3] According to the complaint, Plaintiff told Feda and Schultz that he did not want the dual surgery. He also allegedly requested a "second opinion," asked whether the surgery could be delayed, and asked whether Schultz had talked to the surgeon about doing only the A.C.L. reconstruction, and delaying the high tibial osteotomy. (Id., p. 7, ¶s 11-13.) However, Feda and Schultz allegedly rejected all of Plaintiff's requests, they allegedly told him this was his "only chance" to get his knee repaired, they pressured him "to make a sudden and irrational decision," and they tried to discourage him from changing his mind. (Id.) As described by Plaintiff, Feda and Schultz essentially forced him to undergo a surgery that he strongly opposed.

Feda and Schultz deny Plaintiff's allegations that they pushed him into accepting the surgery proposed by Dr. Levy. (Feda Decl., ¶ 8; Schultz Decl., ¶s 3-6.) For present purposes, however, the Court accepts Plaintiff's contention that Feda and Schultz strongly encouraged him to proceed with the operation.

On June 17, 2009, Plaintiff went back to Dr. Levy at the Mayo Clinic for the two-part operation that he had recommended. Plaintiff met with Dr. Levy before the operation, and reviewed the procedure that was to be performed. Dr. Levy recorded that Plaintiff "was

---

[3] According to Plaintiff, Schultz attended the meeting so he could put additional pressure on Plaintiff, and reinforce Feda's insistence that Plaintiff undergo the dual surgery proposed by Dr. Levy. (See Plaintiff's Response and Memorandum of Law in Opposition of Defendant's Motion to Dismiss or in the Alternative for Summary Judgment, [Docket No. 65], [hereafter "Plaintiff's Response"], p. 6.) However, both Feda and Schultz have stated that Feda asked Schultz to attend the meeting with Plaintiff because of Plaintiff's "extensive criminal history and anti-social behavior." (Schultz Decl., ¶ 3; Feda Decl., ¶ 8.)

fairly adamant that he wanted to proceed with single stage anterior cruciate ligament reconstruction and high tib[ial] osteotomy at the same time."[4] He also signed a consent form, by which he agreed that Dr. Levy should perform both the high tibial osteotomy and the ACL reconstruction. (Krieg Decl., ¶ 8.[5]) The dual surgery was performed that day by Dr. Levy, with assistance from Dr. Michael Stuart, and Plaintiff was returned to FMC-Rochester shortly after the surgery was completed. (Id.)

During the next year or so after Plaintiff's knee surgery, he frequently complained about the outcome of the operation. The record indicates that Plaintiff suffered some residual pain, and he was extremely dissatisfied with the alignment and appearance of his knee.

About five weeks after the surgery, Plaintiff returned to the Mayo Clinic for a post-surgery examination. At that time, Plaintiff complained to Dr. Levy about the appearance of his knee. Dr. Levy reported that –

> "The patient's overall alignment actually looks normal to my eye as well at the time of surgery we actually aligned him down the middle of the knee as opposed to where we normally align high tib osteotomy down the 62.5% over the lateral side, about one third over on the lateral side. The patient had medial compartment joint space narrowing on his standing x-rays, significant tibia varum and significant malalignment and we, therefore, recommended ACL and high tib osteotomy due to the high risk of ACL failure without addressing malalignment. The patient understood this after several, many long discussions with the patient preoperatively. I have asked the patient to let it rehab and see how it feels in a year from now after his osteotomy and ACL have fully healed and he has rehabbed the knee to see whether or not he is still unhappy with the appearance of the leg. The patient asked if we

_____

[4] A copy of Dr. Levy's notes from his pre-operation meeting with Plaintiff are attached to Dr. Krieg's Declaration. (Docket No. 53-2, Attachment B, p. 6.)

[5] A copy of the signed consent form is attached to Dr. Krieg's Declaration. (Docket No. 53-2, Attachment B, p.19.)

could take the plate out and recut the bone and bring it back to a more bow legged position in the future at which point I stated I did not understand why he would want that but that certainly we will reassess the leg in future follow-up with regard to overall alignment and function."

(Krieg Decl., Docket No. 53-2, Attachment B, p. 11.)

Just a few weeks after the operation, Plaintiff met with Defendant Dr. Michael Nelson, the Clinical Director at FMC-Rochester. At that time, Plaintiff "stated that he felt his left knee had too much valgus angle and he felt his left leg was longer than his right." (Declaration of Michael Nelson, [Docket No. 54], [hereafter "Nelson Decl."], ¶ 6.) Plaintiff further complained "that his knee was too straight and that the angle of his knees had to be the same to optimize his athletic abilities." (Id.) Dr. Nelson reviewed Plaintiff's x-rays, and agreed that "it did appear that his left knee had a slight valgus." (Id.) However, Dr. Nelson tried to reassure Plaintiff that it was too early to judge the outcome of the operation, and he advised Plaintiff to continue with his rehabilitation program. (Id.)

Plaintiff met with Dr. Levy a few other times after the operation, and during those meetings Plaintiff repeatedly indicated that he was not happy with the outcome of the operation – primarily because of the way his knee was realigned as a result of the high tibial osteotomy. In September 2009, Plaintiff told Dr. Levy that he was unhappy with the appearance of his leg, that his leg was now shorter, and that he was suffering from hip pain and knee pain. Plaintiff asked Dr. Levy to "take the plate and screws off and put the bone back to its original position." (Krieg Decl., Docket No. 53-2, Attachment B, p. 12.)

Plaintiff expressed similar complaints to Dr. Levy in December 2009, and he again asked Dr. Levy "if he can have the bone realigned and cut back to its original position." (Krieg Decl., Docket No. 53-1, Attachment B, p. 14.) Dr. Levy recommended that Plaintiff

should wait until a full year after the operation, and then talk to Dr. Stuart about the possibility of having another operation. In his notes, Dr. Levy reported that

> "Although the patient is still... not pleased with the cosmetic appearance of the knee, his pre-operative medial sided knee pain has resolved, his osteotomy has healed and is in excellent alignment from my standpoint both clinically and radiographically, he has excellent range of motion, and his ACL graft feels rock solid stable." (Id.)

In May 2010, (nearly a year after the knee operation), Plaintiff was examined by Dr. Stuart. Dr. Stuart's notes indicate that Plaintiff still was "very unhappy" with the alignment of his knee. He tried to explain to Plaintiff that "the full-length standing radiographs show excellent alignment of his left extremity." (Krieg Decl., Docket No. 53-2, Attachment B, p. 16.) However, Plaintiff rejected Dr. Stuart's opinion, and again requested another surgery to "restore" the alignment of his knee. (Id.) Dr. Stuart's report states --

> "I attempted to explain the rationale for the mal-alignment correction in view of his medial compartment chondromalacia and anterior cruciate ligament reconstruction surgery. He was not interested in my opinion and stated that the surgeon should do whatever the patient wishes.

> I, again, attempted to explain the rationale for mal-alignment correction based upon his personal situation..., the orthopedic literature, and my experience. He apparently does not give any credence to my opinion.

> I did suggest that the proximal medial tibial plate and screws could be removed since the osteotomy is healed. This procedure may improve his medial knee pain; however, I am unwilling to perform a medial closing wedge varus producing proximal tibial osteotomy. Despite my attempts to provide an honest opinion, he clearly has made-up his own mind; therefore, I suggested that he consult a different orthopedic surgeon."

(Id.)

Dr. Krieg met with Plaintiff at about the time of Plaintiff's foregoing consultation with

Dr. Stuart.[6]  Plaintiff told Dr. Krieg "that Dr. Stuart and Dr. Levy were pleased with the alignment [of the knee] but he was not."  (Krieg Decl. ¶ 9.)  Plaintiff also reportedly "stated that he could not live with the alignment and was upset that he allowed Dr. Levy to do the re-alignment [i.e., the high tibial osteotomy] along with the ACL repair."  (Id.)  Dr. Krieg was aware of Plaintiff's meeting with Dr. Stuart, and he noted that as result of that meeting, "no further surgery was planned."  (Id., ¶ 10.)  According to Dr. Krieg --

> "While at FMC Rochester, [Plaintiff] became increasingly disgruntled and became quite disrespectful to the orthopedists at Mayo Clinic.  The orthopedists subsequently chose not to consider further participation, such as removal of the hardware, and suggested he find another orthopedist to approach with his request.  It was not clinically necessary that the hardware in [Plaintiff's] left knee be removed."

(Id.)

In light of the conflict and impasse that developed between Plaintiff and his surgeons at the Mayo Clinic, Dr. Nelson, (the Clinical Director at FMC-Rochester), determined that Plaintiff should be transferred to a different prison.  Dr. Nelson recognized that it still might be appropriate to remove the plate and screws from Plaintiff's knee, but he believed that could be done at some other facility.  Dr. Nelson has explained his decision as follows:

> "[Plaintiff] became fixated on the appearance of his left knee.   In [Plaintiff's] last orthopedic consult prior to his transfer, Dr. Stuart from the Mayo Clinic suggested the possibility of removing some hardware, however because of [Plaintiff's] unrealistic expectations he was not willing to operate on him.   At that point, I considered [Plaintiff's] treatment at FMC Rochester complete and [Plaintiff's] care level was changed to reflect his clinical needs.  Hardware removal from a joint is within the capability of any surgeon and is commonly

_____

[6]  The meeting between Plaintiff and Dr. Stuart obviously generated a great deal of mutual animosity.  Dr. Stuart's notes (quoted in the text) show that he was very frustrated by Plaintiff's persistent rejection of his medical advice.  Plaintiff, on the other hand, has alleged that "[d]uring this consult, Dr. Stuart was very rude, unprofessional and he attempted to exit the room several times."  (Complaint, p. 8, ¶ 18.)

done at a Federal Correctional Institution (FCI) since no post-surgical rehabilitation is required."

(Nelson Decl., ¶ 8.)

Thus, at Dr. Nelson's direction, Plaintiff's medical care status was changed from Level 1 to Level 2. As a result of that change, it was no longer necessary or appropriate to keep Plaintiff at FMC-Rochester.[7]

When Plaintiff learned about the change in his medical care status, and his impending transfer from FMC-Rochester, he talked to his case manager about the situation. (Complaint, p. 8, ¶ 22.) The case manager allegedly talked to Dr. Nelson and Dr. Krieg, and they allegedly confirmed that Plaintiff would not be given any further medical treatment for his knee at FMC-Rochester. (Id.)

On May 27, 2010, Plaintiff filed a written grievance with Defendant Christopher Nickrenz, an Associate Warden at FMC-Rochester, who "had general oversight over the medical department." (Declaration of Christopher Nickrenz, [Docket No. 47], ¶s 1, 3.) Plaintiff contended that his Level 1 care status should be reinstated, and he should remain at FMC-Rochester, because he still needed to have the screws and plate removed from his knee. Nickrenz, who is not a medical professional, (id.), deferred to the judgment of the medical staff at FMC-Rochester. He denied Plaintiff's grievance, telling Plaintiff that his care status had been changed to Level 2 "based on your Orthopedic needs." (Plaintiff's Aff., Exhibits [Document 4-1], p. 38.)

---

[7] Plaintiff has acknowledged that once his medical care status was changed, he became "ineligible for FMC." (Plaintiff's Response, p. 9; see also Complaint, p. 8, ¶ 20, ["By placing my care level at a 2, this would make me ineligible to remain at FMC-Rochester, as a work cadre inmate"].)

On June 17, 2010, Plaintiff filed another administrative grievance challenging his impending prison transfer.  (Id., p. 41; Complaint, p. 9, ¶ 26.)  He again asked to be "changed back to care level 1," and he also asked that his transfer "be placed on hold" until he "could receive the necessary medical treatment that [he] needed."  (Id.)  This grievance was handled by Defendant Scott Young, an Associate Warden at FMC-Rochester.

Defendant Young is "not a medical professional," and he "had no involvement in the medical care or medical decisions regarding" Plaintiff.  (Declaration of Scott Young, [Docket No. 49], [hereafter "Young Decl."], ¶ 3.)  Therefore, Young referred Plaintiff's administrative remedy request to the medical staff at FMC-Rochester.  (Id.)  Someone on the medical staff prepared a response, (id.) which indicated that Plaintiff no longer needed further surgery, and his medical treatment at FMC-Rochester was complete.[8]  Based on that input from the medical staff, Defendant Young denied Plaintiff's administrative remedy request.  (Id.)

While Plaintiff's second grievance was still pending, he filed a third grievance with Dr. Krieg.  Plaintiff asked Dr. Krieg how he could get the plate and screws removed from his leg after he was transferred out of FMC-Rochester.  He also asked whether Dr. Krieg would put a note in his medical records showing that he needed further orthopedic care.  Dr. Krieg responded: "As previously discussed, removal of the plate and screws may or may not improve your discomfort.  You may pursue this option at your next facility, if you choose to do so."[9]

---

[8]  Copies of Plaintiff's second grievance and Defendant Young's response are included in the record at Plaintiff's Aff., Exhibits, [Document No. 4-1], pp. 41-42.

[9]  Copies of Plaintiff's third grievance and Dr. Krieg's response are included in the record at Plaintiff's Aff., Exhibits, [Document No. 4-1], p. 39.

Finally, on July 2, 2010, Plaintiff presented a grievance to B.R. Jett, the Warden at FMC-Rochester. (Complaint, p. 10, ¶ 29; Plaintiff's Aff., Exhibits, [Document No. 4-1], p. 40.) In that grievance, Plaintiff complained about "the lack of respect and professionalism" by some unnamed personnel at FMC-Rochester. Plaintiff mentioned that he still had some screws and a plate in his left knee, and he stated that the medical staff was attempting to have him transferred before those objects would be removed from his knee. The grievance was very vague. Plaintiff stated only that he needed the Warden's help, and he wanted "a few minutes" of the Warden's time. (Id.)

Plaintiff alleges that he "personally handed" the grievance to Warden Jett during a lunch period, but Plaintiff's complaint does not clearly indicate whether Jett actually accepted it. (Complaint, p. 10, ¶ 29.) Warden Jett does not recall speaking to Plaintiff about the grievance, but he has stated that if Plaintiff attempted to hand him a grievance, he would have told him to send it "through institutional mail," because the Warden "does not accept cop-outs from inmates." (Declaration of B. R. Jett, [Docket No. 44], ¶ 3.)

On or about July 14, 2010, Plaintiff was transferred to the Federal Correctional Institution in Beaumont, Texas, ("FCI-Beaumont"). (Nelson Decl., ¶ 8.) After Plaintiff arrived at FCI-Beaumont, he apparently followed Dr. Krieg's advice to seek further medical care for his knee at that institution. According to Dr. Nelson, "[h]ardware removal from a joint is within the capability of any surgeon and is commonly done at a Federal Correctional Institution (FCI) since no post-surgical rehabilitation is required." (Id.) This information was confirmed by Plaintiff's experience at FCI-Beaumont. Plaintiff asked to have the hardware

removed from his left knee, and at some point that was done.  (Id.)[10]

The record provides no information about Plaintiff's current medical status.  It is clear, however, that when Plaintiff commenced his present lawsuit in June 2011, he was still very dissatisfied with the outcome of the knee surgery performed two years earlier by Drs. Levy and Stewart.  In an affidavit filed with his complaint, Plaintiff states:

> "To this very day I regret allowing this operation to take place at all!  Twenty-three months after this operation I continue to suffer the after-effects of this with swelling, constant soreness, stiffness and popping sounds in this left knee which feels as though I just had surgery yesterday.  My left knee always hurts and immediately swells upon any attempt to perform any type

---

[10]  After Plaintiff was transferred to FCI-Beaumont, he continued to file administrative grievances related to his medical treatment.  A response to one of those latter grievances includes the following:

> "[Y]ou allege you were transferred from the Federal Medical Center Rochester unjustly and your current institution cannot manage your medical condition.  You further allege you have screws in your leg which need to be removed.  As relief, you request transfer to a different institution, removal of screws in your leg, and re-alignment of the involved leg.

> Medical care at the Federal Correctional Complex (FCC) in Beaumont, Texas, is provided by the University of Texas Medical Branch (UTMB) as part of a comprehensive managed care contract.

> Consultation with the Health Systems Specialist (HSS) was conducted.  According to the HSS, you arrived at FCC Beaumont on August 9, 2010, and were evaluated by a staff physician on August 12, 2010.  You were prescribed pain medication and x-rays were ordered.  X-rays were performed on August 13, 2010, which indicated side plate with multiple screws.  On September 15, 2010, you were evaluated by an orthopedic consultant, who recommended hardware removal and rehabilitation.  On October 14, 2010, you were evaluated for follow up by a staff physician, who determined removal of orthopedic hardware was not clinically indicated at that time.  There is no indication for transfer to a different institution.  Your condition will continue to be monitored by Health Services staff."

(Plaintiff's Aff., Exhibits, [Document No. 4-1], p. 45.)

of physical activity such as running or riding a stationary bicycle and at times still gives out. I haven't been able to reap any benefits of having my ACL repaired since I am in constant pain every single day."

(Plaintiff's Aff., p. 5, ¶ 20.)

## II. PLAINTIFF'S CLAIMS

Plaintiff is presently attempting to sue the United States and seven federal employees who worked at FMC-Rochester while Plaintiff was confined there. The seven individual Defendants are (1) Jessica Feda, the PHS physical therapist who worked with Plaintiff on a regular basis before and after his knee surgery; (2) Jon Schultz, the PHS supervisory therapist, who met with Plaintiff shortly before his knee surgery; (3) Dr. Michael Nelson, the Clinical Director at FMC-Rochester, who was familiar with Plaintiff's knee problems, and approved the change of his care status that precipitated his prison transfer; (4) Dr. Lonnie Krieg, the physician who helped to facilitate Plaintiff's knee operation and follow-up care at the Mayo Clinic, and also approved the change of Plaintiff's care status; (5) Christopher Nickrenz, an associate warden who had general oversight over the medical department at FMC-Rochester, and denied one of Plaintiff's grievances pertaining to the change of his care status and prison transfer; (6) Scott Young, an associate warden who also denied one of Plaintiff's grievances pertaining to his care status and prison transfer; and (7) B. R. Jett, the Warden at FMC-Rochester, who allegedly received a very vague grievance, in which Plaintiff asked for some unspecified "help," and a few minutes of the Warden's time.

Plaintiff is seeking relief in this case based on two distinct legal theories. First, he is attempting to sue the individual Defendants under <u>Bivens</u>, for allegedly violating his federal constitutional rights, and second, he is attempting to sue the United States under

14

the FTCA, to recover compensation for injuries allegedly caused by the negligence of the individual Defendants. Plaintiff is seeking compensatory damages in the amount of $175,000.00 from the United States, and from each of the individual Defendants.[11]

Defendants have filed a motion seeking to have Plaintiff's lawsuit dismissed, because his complaint is legally insufficient, or in the alternative, on summary judgment. The Court finds that Defendants are entitled to summary judgment in this case, for the reasons discussed below.[12]

---

[11] Plaintiff is also seeking injunctive relief that would provide "immediate medical care and corrective procedures to repair and restore plaintiff back to nomral [sic] prior to surgery [on his] left knee,... [and] follow up care by an orthopedic specialist for right-knee." (Complaint, p. 5, § V.) However, Plaintiff cannot be granted injunctive relief against the individual Defendants employed at FMC-Rochester, because his prison transfer has effectively mooted any claims for injunctive relief against those Defendants. See Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (prisoner claims for injunctive relief rendered moot by transfer to a different institution); Randolph v. Rodgers, 253 F.3d 342, 344-46 (8th Cir. 2001) (dismissing prisoner's claims for injunctive relief against prison officials where the prisoner was no longer confined at the facility where those prison officials worked). In addition, Plaintiff cannot be granted an injunction on his FTCA claims against the United States, because "the FTCA provides only for money damages, not injunctive relief." E. Ritter & Co. v. Department of Army, Corps of Engineers, 874 F.2d 1236, 1244 (8th Cir. 1989). See also Estate of Trentadue ex rel. Aguilar v. U.S., 397 F.3d 840, 863 (10th Cir. 2005) ("district court lacks subject matter jurisdiction under the FTCA to provide injunctive and declaratory relief").

[12] Defendants have argued that many of Plaintiff's claims should be summarily dismissed, because he failed to exhaust his available administrative remedies, as required by 42 U.S.C. § 1997e(a). However, the record shows that Plaintiff has pursued his available administrative remedies for many of his claims, and it would be very difficult, in this particular case, to sort out exactly which of Plaintiff's current claims satisfy the exhaustion of administrative remedies requirement. The Eighth Circuit Court of Appeals has pointed out –

"'[E]xhaustion [as required by the PLRA] is not per se inadequate simply because an individual later sued was not named in the grievance[ ]' filed by an inmate.... Instead, the [Supreme] Court [has] ruled that the degree of specificity required in a prison grievance 'will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that

### III. STANDARD OF REVIEW

Summary judgment is appropriate only when the evidence shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Smutka v. City of Hutchinson</u>, 451 F.3d 522, 526 (8th Cir. 2006). A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party bears the burden of bringing forward sufficient admissible evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record. <u>Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.</u>, 950 F.2d 566, 569 (8th Cir. 1991). However, the nonmoving party may

---

define the boundaries of proper exhaustion.'"

<u>Abdul-Muhammad v. Kempker</u>, 486 F.3d 444, 446 (8th 2007), quoting <u>Jones v. Bock</u>, 549 U.S. 199, 218-19 (2007). In this case, Defendants have not addressed the "degree of specificity" required by the BOP's administrative remedy procedures. And again, it is simply not clear how all of the claims presented in Plaintiff's various administrative grievances would "match up" with all of the claims presented here. Thus, for now, the Court will assume (without deciding) that Plaintiff has exhausted his administrative remedies, and the claims listed in the current complaint will therefore be addressed on the merits. <u>See</u> <u>Barrett v. Acevedo</u>, 169 F.3d 1155, 1162 (8th Cir.) ("[a]lthough [in a habeas corpus context] the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated"), <u>cert</u>. <u>denied</u>, 528 U.S. 846 (1999); <u>see also</u> <u>Chambers v. Bowersox</u>, 157 F.3d 560, 564 n. 4 (8th Cir. 1998) ("[t]he simplest way to decide a case is often the best"), <u>cert</u>. <u>denied</u>, 527 U.S. 1029 (1999).

not rest on mere allegations or denials in its pleadings, but must set forth specific admissible evidence-based facts showing the existence of a genuine issue. <u>Forrest v. Kraft Foods, Inc.</u>, 285 F.3d 688, 691 (8th Cir. 2002). "Naked assertions, unsubstantiated by the record," made in rebuttal do not amount to sufficient evidence to preclude summary judgment. <u>Dutton v. University Healthcare Sys., L.L.C.</u>, 136 Fed. Appx. 596 (5th Cir. 2005) (unpublished decision). "A properly supported motion for summary judgment is not defeated by self-serving affidavits." <u>Frevert v. Ford Motor Co.</u>, 614 F.3d 466, 473 (8th Cir. 2010) (quoting <u>Bacon v. Hennepin Cnty Med. Ctr.</u>, 550 F.3d 711,716 (8th Cir. 2008)). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." <u>Id.</u> at 473-74.

The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322. No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> at 323.

## IV. DISCUSSION

### A. <u>Plaintiff's Bivens Claims Against The Individual Defendants</u>

The Supreme Court's decision in <u>Bivens</u> "established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." <u>Carlson v. Green</u>, 446 U.S. 14, 18 (1980). In this case, Plaintiff is claiming that the individual Defendants (who are federal agents) violated his constitutional rights under the Eighth

Amendment, because they did not provide proper medical care and treatment for his knee injury.

### (i) <u>Bivens</u>/Eighth Amendment claims against Feda and Schultz

The record plainly shows that Defendants Feda and Schultz are PHS employees. (Feda Decl., ¶ 1; Schultz Decl., ¶ 1.)  It is equally clear that Feda and Schultz are being sued for their alleged acts or omissions while rendering medical services.  Plaintiff claims that Feda committed various errors while working with Plaintiff during physical therapy. (<u>See</u> Complaint, pp. 5-6, ¶s 1-4.) Plaintiff further claims that both Feda and Schultz gave him poor medical advice when he talked to them before his knee operation.  (<u>See</u> Complaint, pp. 6-7, ¶s 7-13.)

In <u>Hui v. Castaneda</u>, 130 S.Ct. 1845 (2010), the Supreme Court held that PHS employees are immune from <u>Bivens</u> claims arising from the performance of their job-related medical duties.  The Court explained that –

> "This case presents the question whether 42 U.S.C. § 233(a)... precludes an action under <u>Bivens</u>,... against U.S. Public Health Service (PHS) personnel for constitutional violations arising out of their official duties.  When federal employees are sued for damages for harms caused in the course of their employment, the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–2680, generally authorizes substitution of the United States as the defendant.  Section 233(a) makes the FTCA remedy against the United States 'exclusive of any other civil action or proceeding' for any personal injury caused by a PHS officer or employee performing a medical or related function 'while acting within the scope of his office or employment.'  Based on the plain language of § 233(a), we conclude that <u>PHS officers and employees are not personally subject to Bivens actions for harms arising out of such conduct</u>."

<u>Id</u>. at 1848-49 (emphasis added).  <u>See</u> <u>also</u> <u>Bransgaard v. U.S. Bureau of Prisons Health Service Staff</u>, No. 5:11-CT-3122-FL, (E.D.N.C. 2012), 2012 WL 3732822 at *7 (42 U.S.C. § 233(a) "protects commissioned Public Health Service officers and employees from being

subject to suit 'for damage for personal injury ... resulting from the performance of medical, surgical, dental, or related functions'") (quoting <u>Hui</u>, 130 S.Ct. at 1851).

Plaintiff appears to recognize that 42 U.S.C. § 233(a) makes PHS employees immune from <u>Bivens</u> claims, but he argues that PHS employees "can be excluded from this coverage under 42 U.S.C. § 233(i)." (Plaintiff's Response, p. 11.) This argument is unpersuasive here. While Section 233(i) might allow the Attorney General to divest an individual PHS employee of his or her immunity protection under certain very limited circumstances, that can be done only if the Attorney General determines, after a "full and fair hearing," that "treating such individual as such an employee would expose the Government to an unreasonably high degree of risk of loss" by reason of significant personal or professional improprieties.[13] There is absolutely nothing offered by Plaintiff in

_____

[13] 42 U.S.C. § 223 (i), ("authority of Attorney General to exclude health care professionals from coverage"), provides as follows:

(1) Notwithstanding subsection (g)(1) of this section, the Attorney General, in consultation with the Secretary, may on the record determine, after notice and opportunity for a full and fair hearing, that an individual physician or other licensed or certified health care practitioner who is an officer, employee, or contractor of an entity described in subsection (g)(4) of this section shall not be deemed to be an employee of the Public Health Service for purposes of this section, if treating such individual as such an employee would expose the Government to an unreasonably high degree of risk of loss because such individual--

> (A) does not comply with the policies and procedures that the entity has implemented pursuant to subsection (h)(1) of this section;
> (B) has a history of claims filed against him or her as provided for under this section that is outside the norm for licensed or certified health care practitioners within the same specialty;
> (C) refused to reasonably cooperate with the Attorney General in defending against any such claim;
> (D) provided false information relevant to the individual's performance of his or her duties to the Secretary, the Attorney

19

the current record which suggests that the Attorney General has invoked § 233(i) to divest either Feda or Schultz of their immunity protection under § 233(a). Thus, the Court concludes that all of Plaintiff's <u>Bivens</u> claims against Feda and Schultz must be summarily dismissed based on their § 233(a) immunity protection.[14]

### (ii) Eighth Amendment claims against other Individual Defendants

A prison official can be liable for violating a prisoner's Eighth Amendment rights if he or she has acted with "deliberate indifference" to the prisoner's "serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976).

The Eighth Circuit Court of Appeals has explained that --

---

General, or an applicant for or recipient of funds under this chapter; or
(E) was the subject of disciplinary action taken by a State medical licensing authority or a State or national professional society.
(2) A final determination by the Attorney General under this subsection that an individual physician or other licensed or certified health care professional shall not be deemed to be an employee of the Public Health Service shall be effective upon receipt by the entity employing such individual of notice of such determination, and shall apply only to acts or omissions occurring after the date such notice is received."

[14] Having determined that Feda and Schultz are wholly immune from Plaintiff's <u>Bivens</u> claims, the Court will not formally determine whether those claims might otherwise have merit. It bears mentioning, however, that Plaintiffs Eighth Amendment claims against Feda and Schultz could not possibly survive summary judgment even if they had no immunity defense. The record in this case shows that Feda and Schultz did not inflict any "cruel and unusual punishments" on Plaintiff. Plaintiff alleges only that they "pressured" him to undergo a surgery that was recommended by an orthopedic specialist at the Mayo Clinic. This certainly does not indicate that Feda and Schultz harbored any malicious intent to harm Plaintiff. It might be debatable, (especially with the benefit of hindsight), whether the recommended surgery was the best possible medical treatment for Plaintiff, but there is no reason to believe from the evidence in the record that Feda and Schultz encouraged Plaintiff to undergo the surgery, (if they actually did so), because of any malice or antipathy for his welfare.

> "An Eighth Amendment claim that prison officials were deliberately indifferent to the medical needs of inmates involves both an objective and a subjective component.... [P]laintiffs must demonstrate (1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs."

Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citations omitted).

"A prison official exhibits deliberate indifference when the official actually 'knows of and disregards' a prisoner's serious medical needs." Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995, quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994). See also Mays v. Rhodes, 255 F.3d 644, 649 (8th Cir. 2001) ("[d]eliberate indifference requires proof that [the prisoner-plaintiff] suffered objectively serious medical needs and that the [defendants] actually knew of these needs but deliberately disregarded them"). "[D]eliberate indifference requires a highly culpable state of mind approaching actual intent." Choate v. Lockhart, 7 F.3d 1370, 1374 (8th Cir. 1993).

> "Medical malpractice alone... is not actionable under the Eighth Amendment.... [Citation omitted.] For a claim of deliberate indifference, 'the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'"

Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008), quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995).

A prisoner cannot maintain a deliberate indifference claim simply because he disagrees with his medical treatment. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) ("mere disagreement with treatment decisions does not rise to the level of a constitutional violation'"), quoting Estate of Rosenberg, 56 F.3d at 37. See also Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (prisoner's Eighth Amendment claims were properly dismissed on summary judgment because they were based on "nothing more than mere

disagreement with the course of his medical treatment").

As the Court of Appeals explained in <u>Long v. Nix</u>, 86 F.3d 761, 765 (8th Cir. 1996):

> "[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment.  <u>White v. Farrier</u>, 849 F.2d 322, 327 (8th Cir. 1988).  Prisoners do not have a constitutional right to any particular type of treatment.  <u>See</u> <u>id</u>. at 327-28.  Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment.  <u>Taylor v. Turner</u>, 884 F.2d 1088, 1090 (8th Cir. 1989); <u>Kayser v. Caspari</u>, 16 F.3d 280, 281 (8th Cir. 1994)."

With these standards in mind, the Court has reviewed the various claims of deliberate indifference that Plaintiff is attempting to bring against the five remaining Defendants who are not PHS employees.  Having carefully examined the record in this case, the Court finds that Plaintiff has not raised a material fact dispute that any of the named Defendants violated his Eighth Amendment rights.  The record does not show any act or omission by any of the Defendants that could constitute deliberate indifference to Plaintiff's medical needs.

Plaintiff claims that Dr. Nelson violated the federal Constitution, because he allegedly allowed Plaintiff to undergo a knee surgery that was recommended and performed by an orthopedic specialist at the Mayo Clinic.  This claim is without merit.  Plaintiff's own allegations show that Dr. Nelson met with Plaintiff for "at least an hour" to discuss his planned knee surgery.  (Complaint, p. 7, ¶s 14-15.)  Plaintiff further acknowledges that Dr. Nelson volunteered to solicit additional information from another BOP physician.  (<u>Id</u>.)  Whether Dr. Nelson actually received any such additional information before the surgery was performed is irrelevant to Plaintiff's current claims.  It appears on

the face of Plaintiff's own complaint that Dr. Nelson did <u>not</u> ignore Plaintiff's knee problems, but rather, he took an active interest in the matter. Dr. Nelson is not an orthopedic surgeon, (Nelson Decl., ¶ 4), and he obviously deferred to the opinion of the orthopedic experts who were treating Plaintiff, (Drs. Levy and Stuart), with regard to determining the proper course of treatment for Plaintiff's knee injury. Deferring to a medical expert cannot constitute deliberate indifference to a prisoner's serious medical needs. <u>See</u> <u>Liscio v. Warren</u> 718 F.Supp. 1074, 1082 (D.Conn.1989) (prison official "cannot be found to have been deliberately indifferent to plaintiff's medical needs for failing to intervene in [treating physician's] course of treatment for the plaintiff;" prison officials "justifiably may defer to the medical expert regarding treatment of inmates/patients"), <u>rev. on other grounds</u>, 901 F.2d 274 (2nd Cir. 1990); <u>see</u> <u>also</u> <u>McEachern v. Civiletti</u>, 502 F.Supp. 532, 534 (N.D.Ill.1980) (deferring to the professional medical judgment of the doctors attending to prisoner insulates prison officials from Eighth Amendment liability).

Plaintiff also claims that Dr. Nelson, as well as Dr. Krieg, deliberately disregarded his medical needs by changing his care status from Level 1 to Level 2, thereby causing him to be transferred away from FMC-Rochester. (Complaint, p. 8, ¶s 20-22.[15]) This claim must also be rejected. The record shows that Plaintiff met with one of his surgeons, Dr. Stuart, on May 14, 2010. At the conclusion of that meeting, Dr. Stuart determined that the screws and plate in Plaintiff's knee "<u>could be</u> removed," and that doing so "<u>may</u> improve his knee pain." (Krieg Decl., Docket No. 53-2, Attachment B, p. 16, [emphasis added].)

---

[15] <u>See</u> <u>also</u> Plaintiff's Response, p. 9 ("[Krieg] and Nelson conspired together to change the Plaintiff's Care Level from a 1 to a 2 which made the Plaintiff ineligible for FMC.")

Nothing in Dr. Stuart's report suggests that there was any urgent medical necessity or need to remove the screws and plate from Plaintiff's knee. And nothing in the report suggests that removing the screws and plate, (which apparently had been in place for eleven months), would definitively diminish Plaintiff's asserted knee pain. Dr. Krieg understood Dr. Stuart's report to mean that (1) "[i]t was not clinically necessary that the hardware in [Plaintiff's] left knee be removed," and (2) "removal of the plate and screws may not improve his knee discomfort." (Krieg Decl., ¶s 10, 11.) Plaintiff obviously disagrees personally with that assessment, but he has presented no competent, admissible medical evidence to contradict Dr. Krieg's (and Dr. Nelson's) assessment of his medical needs as of May 2010. Plaintiff's mere disagreement with the FMC-Rochester physicians does not substantiate his claim of deliberate indifference. Jolly, supra; Smith, supra.

Furthermore, Dr. Stuart's report from May 2010 clearly indicates that, in his professional judgment, he did not believe any further surgical procedures were medically required, and that Plaintiff should look elsewhere – i.e., somewhere other than the Mayo Clinic – if he wanted to explore other possible treatment for his knee injury. In effect, Dr. Stuart's report signified that Plaintiff's medical treatment at the Mayo Clinic was complete. Because Plaintiff was effectively released from any further treatment at the Mayo Clinic, Dr. Nelson and Dr. Krieg concluded that it was no longer necessary for Plaintiff to stay at FMC-Rochester, and his care status could properly be changed from Level 1 to Level 2. (Krieg Decl., ¶ 12; Nelson Decl., ¶ 8.) Again, while Plaintiff may disagree with that determination, he has presented no admissible evidence showing that Dr. Nelson and Dr. Krieg deliberately withheld any critical medical care.

Dr. Nelson asserts that "[h]ardware removal from a joint is within the capability of

any surgeon and is commonly done at a Federal Correctional Institution." (Nelson Decl., ¶ 8.) This was borne out in Plaintiff's own case, because the hardware in his knee was removed while he was at FCI-Beaumont. (Id.) Plaintiff may believe that the hardware could have been removed sooner if he had stayed at FMC-Rochester, and he may believe that he could have avoided some unnecessary pain if that had happened. However, he has presented no competent, admissible medical evidence to support that proposition. Furthermore, he has offered no reason to believe that Drs. Nelson and Kreig knowingly and deliberately exposed him to prolonged pain by changing his care status. See Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997) ("[a]n inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs"). Again, the record shows that Dr. Nelson believed Plaintiff could receive adequate medical care – including the removal of the hardware from his knee – at a BOP facility other than FMC-Rochester. Thus, the Court concludes that Dr. Nelson and Dr. Kreig did not violate Plaintiff's Eighth Amendment rights by changing his care status from Level 1 to Level 2 and allowing him to be transferred away from FMC-Rochester. Dr. Nelson and Dr. Kreig are entitled to summary judgment on Plaintiff's Eighth Amendment claims against them.

Likewise Defendants Nickrenz, Young and Jett did not violate Plaintiff's Eighth Amendment rights. Plaintiff claims that those three non-medical Defendants violated the Constitution because they did not override the medical decisions made by Dr. Krieg and Dr. Nelson, regarding Plaintiff's care status level and his continuing need for treatment at FMC-Rochester. However, "[p]rison officials lacking medical expertise are entitled to rely on the opinions of medical staff" with regard to a prisoner's health care needs. Holden v.

Hirner, 663 F.3d 336, 343 (8th Cir. 2011). See also Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995) (because prison administrators "lacked medical expertise, they cannot be liable for the medical staff's diagnostic decision" regarding a prisoner's medical treatment); Dowty v. Waukazoo, No. Civ. 11-3025-RAL, (D.S.D. 2012), 2012 WL 4903664 at *9 (sheriff "who is not a medical professional, is entitled to rely upon the opinions of those doctors who are actually treating and trained to treat inmates"). Therefore, Defendants Nickrenz, Young and Jett, who are not health care professionals, were entitled to rely on Dr. Krieg and Dr. Nelson with regard to Plaintiff's health care needs.

Plaintiff believes that Defendants Nickrenz, Young and Jett had a duty, imposed by the federal Constitution, to investigate Plaintiff's true medical needs, and independently determine (a) whether Plaintiff's health care status should be changed, and (b) whether it was medically appropriate to allow his transfer to another prison. However, Plaintiff has cited no law to support this proposition. In fact, it is clear that prison administrators, who are not health care professionals, do not have any constitutional duty to independently assess, and second-guess, the medical opinions of a prison's medical staff. "A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions." Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002), citing Camberos, supra. Indeed, "[p]rison officials cannot substitute their judgment for a medical professional's prescription." Id., citing Zentmyer v. Kendall County, 220 F.3d 805, 812 (7th Cir. 2000). Therefore, Defendants Nickrenz, Young and Jett are also entitled to summary judgment on Plaintiff's Eighth Amendment claims against them.


### (iii) Retaliation Claims

Plaintiff is also attempting to bring a <u>Bivens</u> "retaliation" claim against the individual Defendants. However, Plaintiff's explanation of the basis for this claim is very vague. He contends that --

> "Defendants... violated the Plaintiff's constitutional rights by retaliating against the Plaintiff for exercising his rights under the Eighth Amendment which prohibits cruel and unusual punishment. Prisoners do have a right to receive adequate medical care. Officials do not have discretion to punish inmates for exercising his [sic] First Amendment rights."

(Plaintiff's Response, p. 15.)

Plaintiff apparently believes that at least some of the Defendants in this case, it is not clear which ones, caused him to be transferred to another prison because he sought medical care to which he was entitled under the Eighth Amendment.[16]

"'It is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable ..., even if the act when taken for a different reason, would have been proper.'" <u>Craft v. Wipf</u>, 836 F.2d 412, 419 (8th Cir. 1987), quoting <u>Buise v. Hudkins</u>, 584 F.2d 223, 229 (7th Cir. 1978), <u>cert</u>. <u>denied</u>, 440 U.S. 916 (1979). This means, <u>inter alia</u>, that a prisoner cannot be transferred to a less desirable penal facility in retaliation for asserting a constitutional right. <u>See</u> <u>Goff v. Burton</u>, 7 F.3d 734, 737 (8th Cir.

---

[16] Plaintiff's brief commentary on his retaliatory transfer claim also alludes to the First Amendment, which suggests, perhaps, that he believes his transfer resulted from something he communicated to someone at FMC-Rochester. However, Plaintiff has made no effort to (a) identify any constitutionally-protected communication, (b) identify any specific individual to whom such a communication was made, or (c) explain how any such communication supposedly precipitated his prison transfer. Plaintiff certainly cannot claim that he was transferred in retaliation for the administrative grievances that he filed <u>after</u> his care status level was changed by Drs. Krieg and Nelson, because it was the care status change itself that precipitated Plaintiff's prison transfer. The prison transfer was already foreordained by the change in Plaintiff's care status level before he filed any grievance challenging that change. Therefore, Plaintiff's grievance filings could not have <u>caused</u> his prison transfer.

1993) ("a prisoner cannot be transferred in retaliation for the exercise of a constitutional right"), cert. denied, 512 U.S. 1209 (1994); Ponchik v. Bogan, 929 F.2d 419, 420 (8th Cir. 1991) (same); Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994), cert. denied, 515 U.S. 1145 (1995) (same).

A prisoner bringing a retaliation claim, however, must show that the purpose of the defendant's alleged retaliatory action was to punish the prisoner for attempting to exercise his constitutional rights. More specifically, the prisoner must show that he would not have suffered the alleged retaliatory mistreatment at issue "but for" the defendant's retaliatory motive. A prisoner who claims that he was transferred in retaliation for exercising his constitutional rights must show "that but for his assertions of his constitutional rights, he would not have been transferred." Kind v. Frank, 329 F.3d 979, 981 (8th Cir. 2003). See also Sisneros v. Nix, 95 F.3d 749, 752 (8th Cir. 1996) ("[i]n a retaliatory transfer case, 'the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred'"), (quoting Goff, 7 F.3d at 738).

In this case, Plaintiff cannot sustain a retaliatory transfer claim against any of the named Defendants. The undisputed evidence in the record shows that Plaintiff exerted his Eighth Amendment right to medical attention before he arrived at FMC-Rochester, and he continued to do so during the time he was confined there. The staff at FMC-Rochester did not punish Plaintiff for seeking medical care for his injured knee, but instead, they continuously attempted to treat his knee injury. They provided physical therapy; they sent him to orthopedic specialists at the Mayo Clinic; they authorized (and presumably paid for) the surgical procedure recommended by the Mayo orthopedic specialists; and they provided follow-up rehabilitative care after Plaintiff's surgery. Those actions controvert the

notion that Plaintiff suffered "retaliation" for exerting his Eighth Amendment rights to receive medical treatment.

Plaintiff has submitted no admissible evidence to suggest that Dr. Krieg and Dr. Nelson (assuming they are the subjects of his retaliation claim) changed his care status because he exerted his Eighth Amendment rights; rather, the evidence in the record shows that they did so because they determined there was no longer compelling medical reason to keep him in Rochester after the doctors at the Mayo Clinic announced that they were done treating him. Relying on Mayo's Dr. Stuart decision to end his treatment of Plaintiff becasue in his medical opinion no further followup surgery was warranted, Drs. Krieg and Nelson determined that it was no longer necessary for Plaintiff to remain in FMC Rochester for further medical treatment. As explained by Dr. Krieg, after Plaintiff was discharged by Dr. Stuart, his "care level was subsequently changed from care level 1 to care level 2 <u>based on his medical condition at that point in time and the anticipated frequency of future clinical interventions required for managing his condition</u>." (Krieg Decl., ¶ 12, [emphasis added].) Dr. Nelson has likewise explained that after Plaintiff was discharged by Dr. Stuart, his "care level was changed to reflect his clinical needs." (Nelson Decl., ¶ 8.)

Plaintiff argues that he still needed further medical care after the Mayo Clinic doctors completed their work. He contends, in particular, that his care status level should not have been changed, because he needed to stay at FMC-Rochester to have the medical hardware removed from his left knee. However, Dr. Krieg has stated that there was no urgent need to remove the hardware, (Krieg Decl., ¶s 11, 12), and both Dr. Krieg and Dr. Nelson have stated that the hardware could be removed at a prison facility other than FMC-Rochester, (Krieg Decl., ¶ 12; Nelson Decl., ¶8). Plaintiff has offered <u>no competent,</u>

admissible evidence to contradict the doctors' medical opinions.

In sum, Plaintiff is unable to create a genuine dispute of material fact that his care status level was changed, and he was therefore transferred to a different prison, solely because Dr. Krieg or Dr. Nelson sought to retaliate against him for exerting his Eighth Amendment right to medical care. Therefore, those Defendants are entitled to summary judgment on Plaintiff's retaliation claims.[17]

B. Plaintiff's FTCA Claims Against The United States

The FTCA, (28 U.S.C. §§ 2671 et seq.), provides an express waiver of the federal government's immunity for claims based on certain torts, including medical malpractice, committed by federal agents. United States v. Orleans, 425 U.S. 807, 813 (1976). The FTCA further provides that an individual federal employee cannot be sued for torts committed during the course of his or her employment. Knowles v. United States, 91 F.3d 1147, 1150 (8th Cir. 1996) ("When someone is injured by a tort committed by an employee of the United States who is acting within the scope of his employment, that employee cannot be sued"). The exclusive legal remedy available to a party who has been injured

---

[17] Plaintiff explicitly contends that "Defendants Krieg and Nelson are responsible for the retaliatory transfer against the Plaintiff since they did conspire to change the Plaintiff's Care Level from a 1 to a 2 since the Plaintiff sought to have his knee treated." (Plaintiff's Response, p. 14.) The record confirms that only Drs. Krieg and Nelson were responsible for changing Plaintiff's care status level, and thereby causing his prison transfer. Plaintiff has not even alleged that either Defendant Feda or Defendant Schultz played any role at all in his prison transfer. The other Defendants – Nickrenz, Young and Jett – merely declined to overturn the decisions made by Drs. Krieg and Nelson. There is also no admissible evidence in the record suggesting that Nickrenz, Young or Jett would have overruled Dr. Krieg and Dr. Nelson, "but for" Plaintiff's advocation of his Eighth Amendment rights. Therefore, Plaintiff cannot sustain a retaliation claim against any of those three individual Defendants either.

as a result of a tort committed by a federal employee is a claim against the United States itself, brought under the FTCA. Id. ("the injured person must sue the United States which is liable in its employee's stead").

FTCA claims are subject to, and governed by, the substantive law of the state in which the claim arose. 28 U.S.C. § 1346(b). The FTCA claims that Plaintiff is attempting to bring in this action arose in Minnesota. Therefore, Plaintiff's FTCA claims, including his medical malpractice claims, are governed by Minnesota state law.

Minn.Stat. § 145.682 is a Minnesota law that applies to all medical malpractice actions brought in Minnesota, including malpractice claims brought under the FTCA. Oslund v. United States of America, 701 F.Supp. 710 (D.Minn. 1988); Bellecourt v. United States, 784 F.Supp. 623, 636 (D.Minn. 1992), aff'd 994 F.2d 427 (8th Cir. 1993), cert. denied, 510 U.S. 1109 (1994); Anderson v. United States of America, No. Civ. 5-96-235 JRT/RLE, 1998 WL 92460 (D. Minn. 1998). See also Tineo v. Federal Bureau of Prisons, No. 05-724 (ADM/SRN), (D.Minn. 2005), 2005 WL 1745451 at *2 ("[m]edical malpractice actions brought in Minnesota, including medical malpractice claims brought under the FTCA, are governed by Minn.Stat. § 145.682"); Garcia v. Anderson, No. 08-4731 (ADM/JJG), (D.Minn. 2009), 2009 WL 2900304 at *4 ("[a] federal prison inmate alleging medical negligence under the FTCA must abide by § 145.682"), aff'd, 402 Fed.Appx 150 (8th Cir. 2010) (unpublished opinion).

Section 145.682 requires every plaintiff in a Minnesota medical malpractice case to furnish two affidavits in support of his or her claims. These two affidavits have been described as follows:

"The first affidavit ('expert review affidavit') must be submitted with the

31

> complaint and state that before commencing the lawsuit, plaintiff's attorney reviewed the facts of the case with a medical expert who believed that at least one defendant named in the suit deviated from the applicable standard of care and thereby injured the plaintiff.... [18]
>
> The second affidavit ('expert disclosure affidavit') must be served upon the defendant within 180 days after commencement of the suit and identify each expert plaintiff intends to call at trial, disclose the substance of the facts and opinions to which the expert will testify, and provide a summary of the grounds for each opinion."

Bellecourt, 784 F.Supp. at 636, citing Minn.Stat. § 145.682, subd. 2, subd. 3, and subd. 4, (emphasis added). If a medical malpractice complainant fails to meet either one of the two affidavit requirements set forth in § 145.682, the statute provides for "mandatory dismissal." Minn.Stat. § 145.682, subd. 6; Stroud v. Hennepin County Medical Center, 556 N.W.2d 552 (Minn. 1996); Lindberg v. Health Partners, Inc., 599 N.W.2d 572 (Minn. 1999). See also Stackhouse v. United States, No. 09-839 (PJS/JSM) (D.Minn. 2011) (Report and Recommendation dated February 11, 2011, adopted by Order dated March 1, 2011), 2011 WL 820885 at *24, ("[t]he penalty for failing to comply with Minn.Stat. § 145.682, subds. 2 and 4 is mandatory dismissal").

Here, Plaintiff has not complied with Minn.Stat. § 145.682, because he has not filed the affidavits required by that statute. Because Plaintiff has not submitted the expert witness affidavits mandated by Minnesota law, he has failed to state an actionable FTCA medical malpractice claim. Tineo, 2005 WL 1745451 at *3 (dismissing prisoner's medical malpractice claims for failure to submit expert review affidavit).

The Court recognizes that a plaintiff can be excused from the statutory affidavit

---

[18] If the plaintiff is not represented by counsel, he must file his or her own affidavit of expert review in lieu of an attorney's affidavit. Minn.Stat. § 145.682, subd. 5.

requirements if the defendant's liability can be established without any expert testimony. Minn.Stat. § 145.682, subd. 2; <u>Bellecourt</u>, 784 F.Supp. at 637.  If, for example, a surgeon clearly amputated the wrong limb, expert testimony presumably would not be required to establish negligence.  In the present case, however, it is <u>not</u> self-evident that any government employee committed any medical malpractice.

"In actions against health-care providers, a prima facie case of malpractice is established by showing '(1) the standard of care recognized by the medical community as applicable to the particular defendant, (2) that the defendant departed from that standard, and (3) that the defendant's departure was a direct cause of the plaintiff's injuries.'" <u>McDonough v. Allina Health System</u>, 685 N.W.2d 688, 697 (Minn.App. 2004), quoting <u>Fabio v. Bellomo</u>, 504 N.W.2d 758, 762 (Minn.1993).  "Expert testimony is generally required in medical-malpractice cases because they involve complex scientific or technological issues.... [Citation omitted]  An exception to this rule applies when the alleged negligent acts are within the general knowledge or experience of laypersons.... [Citation omitted]  But only rarely does section 145.682 not apply."  <u>Mercer v. Andersen</u>, 715 N.W.2d 114, 122 (Minn.App. 2006).

Plaintiff seems to believe that no medical evidence is required to prove that the so-called "botched surgery" on his knee was the result of medical malpractice.  (Plaintiff's Response, p. 12.)  He contends this is a "res ipso loquitor [sic]" case that can be resolved without any expert testimony.  (<u>Id</u>., pp. 13-14.)  That argument must be rejected.  Even if it were obvious that the knee surgery itself must have involved some type of negligence, (which certainly is <u>not</u> obvious), that would establish only that the Mayo Clinic surgeons who recommended and performed the surgery were negligent.  It is by no means self-

evident that any of the federal employees named in Plaintiff's complaint did anything (or failed to do anything) that a layperson could properly identify as medical malpractice, without any need for expert testimony. Plaintiff would have to provide expert witness testimony in order to prove that a federal health care provider caused him to be injured by rendering medical services that did not meet applicable standards of medical care. Plaintiff cannot prove his FTCA malpractice claims by merely standing in front of a jury, pointing to his knees, and claiming that someone performed a "botched surgery." A jury could not return a verdict in Plaintiff's favor on his medical malpractice claims unless those claims were supported by expert witness testimony. Simply put, this is <u>not</u> a <u>res ipsa loquitur</u> case. Because Plaintiff's FTCA medical malpractice claims are not supported by the expert witness affidavits required by Minnesota law, those claims must be dismissed on summary judgment.

Finally, the Court recognizes that the affidavit requirements of Minn.Stat. § 145.682 apply only to FTCA medical malpractice claims brought against "health care providers." <u>See</u> Minn.Stat. § 145.682, subd. 2. The statute clearly applies to Plaintiff's claims based on the alleged acts or omissions of any members of the medical staff at FMC-Rochester, including Defendants Krieg, Nelson, Schultz and Feda.[19] However, if Plaintiff is attempting

---

[19]  The definition of the term "health care providers" at § 145.682, subd. 1, refers to Minn.Stat. 145.61, subd. 2, which in turn refers to Minn.Stat. Chapters 147 and 148. Those two chapters confirm that physicians, (such as Defendants Krieg and Nelson), and physical therapists, (such as Defendants Schultz and Feda), are "health care providers" for purposes of § 145.682. Although it does not appear that Plaintiff is attempting to bring an FTCA claim based on any acts or omissions by Dr. Levy or Dr. Stuart, the Court notes that they would undoubtedly be treated as health care providers for purposes of § 145.682. Therefore, any malpractice claim based on their alleged acts or omissions would be subject to the § 145.682 expert affidavit requirements.

to bring any FTCA claims based on the acts or omissions of other employees at FMC-Rochester who are <u>not</u> health care providers – i.e., Defendants Nickrenz, Young or Jett – § 145.682 would not be applicable.

It is unclear whether Plaintiff is attempting to bring common law negligence claims (under the FTCA) based on alleged acts or omissions by Defendants Nickrenz, Young and Jett. Plaintiff's complaint includes vague allegations that might have been intended to support FTCA claims based on some alleged negligence committed by those three federal employees.[20] It appears to the Court that these allegations were intended to support Plaintiff's <u>Bivens</u> claims against Defendants Nickrenz, Young and Jett. However, if these allegations were intended to also support an FTCA claim, they fail to do so.

In Plaintiff's opposition to Defendants' current motion, he vaguely asserts that "Defendants Jett, Nickrenz, Young and Krieg were also negligent since they failed to exercise the minimal duty of care owed to the Plaintiff." (Plaintiff's Response, p, 17.) This conclusory allegation is unexplained and unsupported by any admissible evidence identified by Plaintiff and it is therefore inadequate to rebut Defendants' summary judgment motion.

As discussed above, Nickrenz, Young and Jett met their respective duties to care for Plaintiff's medical needs by affording him access to the medical staff at FMC-Rochester,

---

[20] Plaintiff alleges that "Mr. Nickrenz is responsible by breach of duty for not intervening in this situation which caused me to be transferred when it was well known that I needed further medical treatment." (Complaint, p. 9, ¶ 25.) He alleges that "Mr. Young is personally responsible since he failed to exercise some form of care or concern for my medical needs, due to the fact that he was the acting Warden who denied my request for remedy." (<u>Id</u>., ¶ 28.) And it is further alleged that "Mr. Jett breached a duty of level of care since he did not exercise concern by intervening in a situation that was detrimental to my medical needs." (<u>Id</u>., p. 10, ¶ 29.)

and acting in accordance with the medical staff's professional decisions.  See Holden, supra ("[p]rison officials lacking medical expertise are entitled to rely on the opinions of medical staff" with regard to a prisoner's health care needs).  If Defendants Nickrenz, Young and Jett had not acted in accordance with medical staff recommendations, then they might have breached a duty owed to Plaintiff.  However, the Court rejects the notion that prison administrators, who are not health care providers, have a legal duty to independently evaluate a prisoner's health care needs, and treat those needs as they deem appropriate, regardless of what the prison medical staff has determined.  Plaintiff has cited no legal authority to support such a notion, and the Court is not otherwise aware of any such authority.  Thus, the Court concludes that Defendant United States is entitled to summary judgment with regard to all of Plaintiff's FTCA claims – including any claims based on the alleged negligence of federal employees who are not health care providers.

## V.  CONCLUSION

Plaintiff injured his knee playing football while in prison.  The knee injury did not heal promptly, so the BOP sent Plaintiff to FMC-Rochester for medical treatment.  At FMC-Rochester, Plaintiff received physical therapy, and he was later sent to the Mayo Clinic for a consultation with an orthopedic specialist.  The specialist recommended a particular form of surgery, and Plaintiff consented to have that surgery performed.  The medical staff at FMC-Rochester facilitated the surgery, cared for Plaintiff during his recovery, and provided more physical therapy during Plaintiff's lengthy rehabilitation.

A year after the surgery, one of the surgeons at the Mayo Clinic examined Plaintiff, and reported that no further treatment was medically necessary nor would any further care be performed at the Mayo Clinic.  At that time, Plaintiff was (and he still is) extremely

36

unhappy about the outcome of the surgery, and he still had a plate and some screws in his knee.  However, based on the Mayo surgeon's report, the medical staff at FMC-Rochester, (specifically Dr. Krieg and Dr. Nelson), determined in their professional medical judgment that (a) it was not medically necessary to immediately remove the "hardware" from Plaintiff's knee, (b) removing the hardware would not necessarily definitively improve Plaintiff's residual complaints of pain, (c) the hardware could easily be removed in clinical settings available elsewhere, and (d) there was no continuing medical need to keep Plaintiff at FMC-Rochester.  Based on this understanding of the situation, Dr. Krieg and Dr. Nelson concluded that Plaintiff's care status could be changed from Level 1 to Level 2, and he could be transferred away from FMC-Rochester.  Defendants Nickrenz, Young and Jett, non-healthcare providers, accepted and relied on the medical staff's professional determinations, and therefore, they declined to block Plaintiff's prison transfer.

These are the facts shown by the present record.  Based on these facts, no reasonable jury could conclude that any of the individual Defendants violated Plaintiff's federal constitutional rights.  Furthermore, Plaintiff cannot maintain an FTCA medical malpractice claim, because he has presented no expert witness affidavits showing that any health care provider at FMC-Rochester (or the Mayo Clinic) failed to meet applicable standards of medical care, and thereby caused him injury.  Plaintiff is also unable to show that he was injured due to the negligence of any federal employee who is not a health care provider, (i.e., Defendants Nickrenz, Young and Jett), because those employees acted in accordance with the decisions and recommendations made by the prison medical staff.

Thus, the Court concludes that none of Plaintiff's <u>Bivens</u> claims or FTCA claims can

survive Defendants' motion for summary judgment.[21]  The Court will therefore recommend that Defendants' motion be granted, and that this action be dismissed with prejudice.

## VI. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:


1.  Defendants' Motion To Dismiss Or, In The Alternative For Summary Judgment, (Docket No. 40), be **GRANTED**; and

2.  This action be **DISMISSED WITH PREJUDICE**.


Dated: January 25, 2013

 s/Leo I. Brisbois
LEO I. BRISBOIS
United States Magistrate Judge

### N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by February 8, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof.  Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or

---

[21]  Having determined that none of Plaintiff's claims are sustainable, the Court will not specifically address Defendants' qualified immunity defense.  See Holden, 663 F.3d at 343 ("[b]ecause we conclude Holden failed to demonstrate the deprivation of a constitutional right, we do not discuss further the prison officials' claim of qualified immunity").  The Court also finds it unnecessary to address Defendants' arguments regarding the capacity in which they are being sued, because Plaintiff has not presented a sustainable claim against any Defendant in either an individual or official capacity.

judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.